## Case No. 423.

### The ANNIE M. SMULL.

[2 Sawy. 226.][1]

District Court, D. Oregon. June 25, 1872.

ADMIRALTY JURISDICTION ON COLUMBIA RIVER— SEAMEN'S WAGES—DISCHARGE OF CARGO.

1. The U. S. district court for the district of Oregon has concurrent jurisdiction over the Columbia river.

2. A voyage is ended and a seaman's wages become due when the vessel is moored at her final port of destination, and if such wages are not paid within ten days thereafter, the seaman is entitled to admiralty process against the vessel.

[See Edwards v. The Susan, Case No. 4,299.]

3. A seaman is not bound to stay by the ship after her arrival at the final port of destination, and assist in discharging her cargo, unless the shipping articles contain a contract to that effect or the established custom of the port requires it.

[In admiralty. Libel by John Johnson and eight others against the Annie M. Smull for wages. Decree for libellants.]

John A. Woodward and David Goodsell, for libellants.

Theodore Burmester, for claimant.

DEADY, District Judge. This is a suit for the subtraction of wages brought by John Johnson and eight others to recover the sum of $578 alleged to be due said Johnson and others for services as seamen on a voyage in the Annie M. Smull from New York to Kalama, between December, 1871, and the latter part of May, 1872.

On June 5, process was issued upon the libel, upon which the ship was arrested the same day. Subsequently the owner, Charles Mallory, by the master, intervened for his interest and filed exceptions to the libel,

[1][Reported by L. S. B. Sawyer, Esq., and here reprinted by permission.]

which, by consent of counsel, were argued and submitted on June 17.

The first exception is in the nature of a plea in abatement, and alleges that the court has not jurisdiction of the suit, because it appears from the libel that the vessel is not within the district of Oregon, but at the time of filing the libel was and ever since has been lying in the Columbia river, off Kalama, in Washington territory.

The question made by this exception turns upon the construction of the constitution of the state and acts of congress defining its boundaries and establishing the judicial district of Oregon.

The constitution of the state (article 16, § 1) provides that its northern boundary shall commence one marine league at sea, "due west and opposite the middle of the north ship channel of the Columbia river, thence easterly to and up the middle channel of said river, and where it is divided by islands, up the middle of the widest channel thereof * * * including jurisdiction in civil and criminal cases upon the Columbia river * * * concurrently with states and territories of which this river forms a boundary in common with this state."

In admitting Oregon into the Union by the act of February 14, 1859, (11 Stat. 383, [Rev. St. § 4530,]) congress assented to this boundary, including the provision concerning concurrent jurisdiction on the Columbia river, and also enacted (section 2 of the act aforesaid) that, "the state of Oregon shall have concurrent jurisdiction on the Columbia and other rivers and waters bordering on the said state of Oregon, so far as the same shall form a common boundary to said state, and any other state or states now or hereafter to be formed or bounded by the same;" and that said river and other waters shall be "common highways" for all citizens of the United States.

By section two of the act of March 3, 1859, (11 Stat. 439), it was provided that: "The said state (Oregon) is hereby constituted a judicial district of the United States, within which a district court * * * shall be established."

In support of the exception, counsel maintains that the state of Oregon is bounded by the middle line of the Columbia river, and that the district of Oregon being in effect declared to be co-terminous with the state, it follows that the Annie M. Smull is without the district, and, therefore, not within the jurisdiction of this court; and that the clause in the constitution of the state and act of congress, giving the state concurrent jurisdiction over the whole river, does not affect or enlarge its boundaries, but is in the nature of a special reservation, or grant of power, to the courts of the state, which does not apply to or include this court.

In reply, counsel for the libellants maintain that the clause in question, by giving

the state jurisdiction over the whole of the Columbia river does, in effect, make the north shore thereof the boundary of the state, and therefore of the district as well. No authority directly in point was cited on the argument, nor have I been able to find any.

As the law stands, it is admitted that the boundary of the state and district are identical. It is also clear that congress had the power to give this court jurisdiction, either concurrent or exclusive, over the whole river, of matters within the judicial power of the United States, and that the public convenience requires that it should have it. The only question then to be considered is, has congress done so? In my judgment it has. The argument of counsel for the exception, does not correctly state the terms or effect of the clause concerning the concurrent jurisdiction of the state. It is not merely a special grant of judicial power to the courts of the state over persons and things upon the river, but without the boundary of the state. It is a legislative declaration or enactment that the jurisdiction of the state—that is, its whole sovereign power shall extend to the whole river, subject to the qualification that the jurisdiction of the state or territory on its northern shore, shall in like manner extend to its southern shore. In effect, this makes the northern shore of the river the northern boundary of the state, for its territorial limits and jurisdiction are necessarily the same. Practically, then, so far as the Columbia river forms a boundary common to Oregon and Washington, it is within the territorial limits and jurisdiction of each. In the language of the act of February 14, 1859, aforesaid, it is the common property and "highway" of both. This being so, the river is also within the jurisdiction of the district of Oregon, and therefore this court has jurisdiction of this suit.

What is here said upon this subject is, however, only intended to apply to jurisdiction over matters and things actually arising or situate upon the river. The concurrent jurisdiction is not understood to extend over any islands or dry land within the river. As to such, and probably only such, the middle thread of the river is the absolute boundary line of both state and district.

It is also stated in this exception, that the vessel was "moored at the wharf at Kalama," a town on the Washington territory shore, and some reference was made to this fact in the argument. But I do not perceive on what ground it can be claimed that a vessel which is in fact floating or lying upon or in the river, is to be considered as without the district, because it may be fastened or moored to the northern shore of the river, or to any wharf or other structure erected thereon.

The second exception is a dilatory one, and alleges that process was issued on the libel prematurely, to wit, "before the said vessel was discharged of her loading and the voyage ended," contrary to the statute, etc. This exception is based upon section six of the act of July 20, 1790, (1 Stat. 133; [Rev. St. § 4530,]) which provides that "as soon as the voyage is ended, and the cargo or ballast be fully discharged at the last port of delivery, every seaman or mariner shall be entitled to the wages which shall then be due according to his contract; and if such wages shall not be paid within ten days after such discharge, or if any dispute shall arise between the master and seamen or mariners, touching the said wages, it shall be lawful," etc.

The warrant for the arrest of the vessel was issued June 5. From the amended libel which was filed the same day, it appears that the vessel arrived at Kalama, on or about June 23, when and where the voyage for which the libellants shipped was ended, but it does not appear that the cargo was discharged.

The allegation in the exception that process was issued before the cargo was discharged, and the voyage ended, does not conflict with the one in the libel, to the effect that the voyage was ended when the vessel was moored at Kalama; and for the purpose of the exception it was admitted on the argument that the voyage terminated at that place. But it is insisted by counsel for the exception, that under the act of 1790, supra, process against the vessel cannot issue until ten days after the discharge of the cargo as well as the ending of the voyage.

In The Mary, [Case No. 9,191,] it was held that the ten days "begin to run from the time when the wages become due, that is, from the day when the term of service is completed." In Granon v. Hartshorne, [Case No. 5,689,] it was held that when the ship had reached her port of final destination, and was safely moored at the berth, that the voyage was then terminated and all sea services on board connected therewith.

After some conflict of opinion the clause in the act, "and the cargo or ballast be fully discharged," has been construed by the courts as being applicable only "to those cases in which, either by express terms of the contract or by the established custom of the port, the crew are bound to stay by and unload the ship, and are actually retained in service for that purpose." But where there is no such contract or usage, the wages become due on the day of the termination of the voyage—the seaman's discharge—and he is entitled to process against the vessel on the eleventh day thereafter—the ten days being computed from the termination of the voyage, when the wages become due without reference to the discharge of the cargo or ballast. 2 Conk. Adm. 48.

It does not appear that there was any contract in this case, to stay by the ship until the cargo was discharged, or that there

is any established custom requiring the seamen to do so, and ten days having elapsed from the ending of the voyage before the issuing of process, this exception is not well taken and must be disallowed.

The third exception alleges that the facts stated in the libel are insufficient in this, "that the libellants abandoned the said vessel before her cargo was fully discharged."

The ruling upon the second exception disposes of this one. If the voyage ended with the mooring of the ship at Kalama, the libellants were then entitled to their wages and discharge, whether the cargo was unladen or not.

Besides, this exception is not well pleaded, because, while taken to the sufficiency of the libel, it also sets up a new fact, to wit: that the libellants unlawfully abandoned the ship, and relies upon that rather than the insufficiency of the libel, as a defense to the suit.